184 F.2d 359
 GENERAL MILLS, Inc.
v.
GOLDMAN (INDIANA LUMBERMENS MUT. INS. CO. OF INDIANAPOLIS, INDIANA, Intervener).
 No. 14087.
 United States Court of Appeals Eighth Circuit.
 September 19, 1950.
 Rehearing Denied November 9, 1950.
 
 A. Lyman Beardsley, Minneapolis, Minn., and D. E. Balch, Washington, D. C. (Frank J. Morley, Edward K. Thode, and Morley, Cant, Taylor & Haverstock, all of Minneapolis, Minn., were with them on the brief), for appellant.
 Irving H. Green, Minneapolis, Minn. (Robins, Davis & Lyons and H. Z. Mendow, all of Minneapolis, Minn. were with him on the brief), for plaintiff-appellee.
 W. M. Kronebusch, Minneapolis, Minn. (O'Brien & Kronebusch, Minneapolis, Minn., were on the brief), for intervener-appellee, Indiana Lumbermens Mut. Ins. Co. of Indianapolis, Indiana.
 Before SANBORN, WOODROUGH and RIDDICK, Circuit Judges.
 WOODROUGH, Circuit Judge.
 
 
 1
 This action was brought by Harry Goldman as plaintiff against General Mills, Inc., as defendant, to recover damages suffered by the owners of a manufacturing plant located on Hiawatha Avenue in Minneapolis through its destruction by fire on January 15, 1948. General Mills was in possession of and operating the plant as a tenant under a ten year lease at the time of the fire and the action was in tort based upon plaintiff's claim that the fire and resultant damages were caused by defendant's negligence. The defendant denied that the fire was caused by negligence on its part and pleaded that the terms of its lease excepted it from obligation to the lessor in the event of "loss by fire" of the plant and exonerated it from liability to the owners for the destruction of the property by the fire.[1] The plaintiff stood in the shoes of the owners of the property in respect to the claim against the defendant for damages by virtue of assignments and there was federal jurisdiction on account of diversity of citizenship. The law to be applied was that of Minnesota.
 
 
 2
 On the trial of the case the court determined as a matter of law that under the terms of the lease which except the tenant from obligation in the event of "loss by fire" of the leased plant the tenant was not excepted from liability for "loss by fire" if the fire occasioning the loss was caused by negligence on the part of the tenant. Defendant's position was and is that it does not know what caused the fire, but there was evidence that the fire started when a man named Ojala, in the course of his work as an employee of defendant, placed a hot, freshly cast aluminum pot in the sump of a Bullard machine for the purpose of cooling the casting. The sump contained a mixture of B-1 and kerosene and plaintiff claimed that the act was negligent and caused the fire. The court submitted the issue as to whether negligence of defendant was a proximate cause of the fire to the jury, and the jury returned a verdict on that issue in favor of the plaintiff,[2] which was sustained by the court over defendant's motion to set it aside for want of evidence to support it. The parties in open court stipulated to the effect that if defendant was liable the amount of liability should be fixed at $142,500. The court, in pursuance of its own determination that defendant was not excepted from liability by the terms of the lease if defendant's negligence caused the fire, the finding of the jury that defendant's negligence was a proximate cause of the fire, and the stipulation of the parties as to the amount of damages, entered judgment for plaintiff against defendant for $142,500 and costs.
 
 
 3
 General Mills appeals and contends for reversal among other things, that the undisputed evidence established that the lease provisions were drawn and were agreed to in contemplation of the mutual understanding of the parties that the risk of loss by fire of the demised premises would be carried by a fire insurance company and not by either of the parties to the lease. That the amount of the rental of $15,000 a year plus taxes was agreed to on that basis and therefore included the cost of fire insurance. That the true intent and meaning of the contract of lease between the landlords and the tenant in force and effect at the time of the fire was that the tenant should not be liable to the landlords for the loss by fire of the leased premises and that the exoneration from liability for loss by fire mutually agreed upon was not limited expressly or by implication to fire occurring without negligence but extended to and included fire caused by negligence of an employee of the tenant engaged in the manufacturing for which the premises were demised. That such contract was valid and binding upon the parties under Minnesota law and that the court erred in its determination that the tenant was not thereby exonerated from liability in the action. That the court erred in refusing to enter judgment for defendant.
 
 
 4
 The considerations upon which the trial court determined that the general law of negligence was applicable to the action and that the lease provisions covering loss by fire did not except the defendant from liability for the loss by fire of the manufacturing plant if the fire was caused by negligence attributable to the defendant are set forth in the opinion of the court which accompanied its order denying defendant's motion for judgment or in the alternative for new trial. In the opinion the court correctly stated the settled law in Minnesota that whether the lease provisions exempted defendant from loss by fire caused by its negligence depended upon the intent of the parties to the contract and that that intent was to be determined by reading the contract as a whole in the light of the subject matter, surrounding circumstances, the objects and purposes and the natural meaning of the language used. The court also recognized, as the undisputed evidence conclusively showed, that "the understanding was that plaintiff assumed the responsibility for the insurance coverage on the building for fire * * *" and that the landlords did take out the fire insurance and that on proof of the "loss by fire" the insurance company paid the full amount of the insurance in a sum exceeding the landlord's total investment in the property. But the court noted and stressed the fact that "the lease does not require the lessor to carry any insurance" and that it contained no express agreement that the lessor would pay the fire insurance premiums out of the rentals. It concluded that "the insurance obligations of the plaintiff do not aid defendant here" and it attached no significance favorable to defendant to any of the evidence in the record concerning the contemplated and executed coverage of the risk of "loss by fire" by the fire insurance company. On the contrary, it approached the inquiry as to what was in the minds of these parties and what they meant in respect to the happening of loss by fire of the leased property from considerations of abstractly possible meanings of "loss by fire" in the paragraph of the lease where the words are found and of the public policy involved in contracting against obligation for one's own negligence and of whether the word "fire" in the lease ought to be strictly construed against or liberally construed in favor of the tenant. Through its approach and course of reasoning it came to the conclusion that the parties did not intend that the tenant should be relieved from liability for a loss by fire if the fire occurred in the ordinary way in which fires in manufacturing plants occur[3] but that they meant that the tenant should be so relieved only if the fire occurred in some such extraordinary way not illustrated by example as to present nothing on which a jury could find negligence as a cause thereof. The interpretation so put upon the covenant of the lease for exemption of the lessee from liability for loss by fire reduced the covenant for exemption as a practical matter to triviality so far as General Mills was concerned and the unfortunate destruction by fire led to an award to plaintiff of some $30,000 more than his predecessors in interest had invested in the property the year before.
 
 
 5
 But we think the court erred in attempting to ascribe an intent and meaning to the exception of loss by fire provision of this lease independent of the mutual understanding of the parties when the lease was entered into that loss by fire should be provided against by fire insurance coverage and that the conclusion and judgment the court arrived at were erroneous.
 
 
 6
 It may be true that a covenant in a lease that the tenant shall be excepted from obligation to the landlord for loss by fire does not absolutely in all circumstances relieve the tenant from liability for fire caused by its negligence. Though the word "fire" in the phrase is unqualified and inclusive and therefore unambiguous, the courts may, as they have in instances cited in the court's opinion and in the briefs, consider whether a contracting for exemption from liability for one's own negligence should not be favored or enforced by courts or is contrary to public policy and they have by "strict construction" — that is, by giving the word "fire" a narrower meaning than it has in common parlance, excluded negligently caused fires from such an exemption.
 
 
 7
 But there is no public policy in Minnesota inimical to resort to fire insurance covering loss by fire occurring with or without negligence and there is no reason for applying any "strict construction" to a lease entered into in contemplation of having a fully appreciated and guarded against fire risk carried by an insurance company. The undisputed evidence in this case presents exactly that situation. The landlords here agreed that the tenant should not be liable to pay for "loss by fire" because it was understood between them that fire insurance would be taken out and a fire insurance company would be required to pay for any "loss by fire" occurring on the premises during the term of the lease. Such insurance company would be required to pay whether the "loss by fire" was caused by negligence or not as fire insurance universally covers loss by fire occurring from the kind of negligence here involved. The premiums to fire insurance companies are based on actuarial computations of fire losses so occuring. The policies are standardized and we are informed of no other kind of fire insurance in use in this country.
 
 
 8
 It resulted from the plan on which the lease document here was conceived and formulated to express the parties' respective covenants and obligations that it was not necessary to and the parties did not incorporate in the lease itself any express obligation of the landlord to take out fire insurance nor any express obligation to apply part of the rental to fire insurance cost. All of the respective obligations which the landlord and the tenant assumed towards each other were set forth with meticulous care but the all important matter of "loss by fire", in the forefront of the minds of the parties, was simply and effectively covered in the lease by squarely excepting the tenant from liability for "loss by fire" and as a reciprocal provision by specifically obligating the tenant not to use or to permit anything on the premises that will increase the rate of insurance thereon. The release of the tenant from obligation or liability for "loss by fire" removed all interest on the part of the tenant to exact specific obligations of the landlord in the lease in respect to fire insurance and the landlord was left free as it wanted to be to control the fire insurance as to amounts, terms and companies. The reciprocal obligations of the tenant to subordinate its use of the premises to the contemplated fire insurance requirements specifically referred to in the lease and the tenant's obligation to pay a rental agreed to in view of the fire insurance cost to the landlord, considered with the release of the tenant from loss by fire, completely and unequivocally express the mutual intention to relieve the tenant from loss by fire regardless of negligence and the provisions fully preserved the relating of the lease to the mutual understanding that loss by fire would be covered by fire insurance.
 
 
 9
 Examination of the lease reveals a studied effort to state in detail every one of the very numerous obligations imposed on the tenant and to impose specific liability and accord remedy to the landlord for each and every breach regardless of negligence. But in respect to the all important matter of loss by fire of the manufacturing plant which was ever present in the minds of the parties, no obligation was imposed and nothing was said about it except that the tenant was relieved from liability. Considering the minute particularity in specifying every liability of the tenant, it is not credible that liability for negligence causing loss by fire would not have been specified if there had been any intention that there should be such liability.
 
 
 10
 The lease also provides under the caption "Destruction by Fire" that in case of a fire totally destroying the building the lessor had the option to terminate the lease or to rebuild. It appears that at the time General Mills signed the lease plaintiff's predecessors in interest did not own the property and General Mills signed on condition that "it be executed [within a certain time] by a Lessor then having, in the opinion of Counsel for Tenant, good and merchantable title to the premises". The landlords executed the lease within the time and bought the property subject to the lease for investment for income purposes. They paid $110,000 for it, of which they raised $80,000 "by mortgage". The fire insurance rate on the plant leased for "general manufacturing, warehouse and office purposes", was high because the fire risk was great. The reservation on the part of the landlords of the privilege to rebuild at their own expense without requiring contribution from the tenant (whether it had been negligent or not) is further strong indication of the mutual intention that the risk of the loss by fire should be carried as it was carried by a fire insurance company and that the tenant had no obligation in the event of loss by fire. Having borrowed most of the money to acquire the property the landlords contemplated rebuilding or restoring minor fire damage out of insurance money.
 
 
 11
 The circumstances also indicate the intention that the cost of the insurance would be taken out of the rentals. The investing for income purposes of their own and the borrowed money by the plaintiff's predecessors necessarily involved computing the rentals promised in the lease and deducting the cost of fire insurance at the applicable high rate. They could not estimate the income without considering both factors. They necessarily consciously figured on the rentals to be paid by the tenant as the source of the fire insurance premiums and intended that the cost of insurance was to come from the tenants. In practical effect the tenant paid the cost of the fire insurance.
 
 
 12
 It is very clear in the light of all the provisions of the lease, the circumstances of its execution and the understanding about fire insurance coverage to which the lease was related that by the provision that on termination of the lease the tenant should return the property in good condition "loss by fire * * * excepted" the parties meant a loss by fire such as is always meant when men are talking about or figuring on the risk of it in business dealings — i. e., the "loss by fire" which always is insured against in ordinary course and against which the landlords here intended to and did take out insurance in an amount greater than the owners' investment.
 
 
 13
 When the lease here is so read and understood the agreement of the lease is simple, normal and reasonable and such as intelligent men would be expected to agree upon. The fire which occurred and the consequent loss were within the contemplation of the parties and was covered as they meant that it should be by the fire insurance.
 
 
 14
 When we turn to the Minnesota law we find nothing to impugn the validity and binding effect of the contract to release the tenant. On the contrary, the highest public policy is found in the enforcement of the contract as it was actually made. Santa Fe Railway v. Grant Bros., 228 U.S. 177, 188, 33 S.Ct. 474, 57 L.Ed. 787. We find the following Minnesota decisions fully support a contract between private parties relating to their private relationships to relieve one of such parties from liability for his own negligence: Pettit Grain Co. v. Northern Pacific Ry. Co., 227 Minn. 225, at page 230, 35 N.W.2d 127, at page 130; Weirick v. Hamm Realty Co., 179 Minn. 25, at page 28, 228 N.W. 175, at page 176; Commercial Union Assurance Co. v. Foley Bros., 141 Minn. 258, at page 261, 169 N.W. 793, at page 794; James Quirk Milling Co. v. Minneapolis & St. Louis R. Co., 98 Minn. 22, 107 N.W. 742, 116 Am.St.Rep. 336; Michigan Millers Mutual Fire Ins. Co. v. Canadian Nor. R. Co., D.C., 58 F.Supp. 326, affirmed, 8 Cir., 152 F.2d 292.
 
 
 15
 In all standard fire insurance contracts there is the same contracting against "loss by fire" through negligence as appears in this lease but there is no decision in Minnesota that questions its validity or asserts any public policy against it.
 
 
 16
 It is concluded that the judgment was erroneous and that the court erred in refusing to enter judgment for defendant and the judgment is accordingly reversed and the case remanded with direction to enter judgment for defendant at plaintiff's cost.
 
 
 17
 The Intervention. The Indiana Lumbermen's Mutual Insurance Company of Indianapolis is the fire insurance company which issued the fire insurance policies covering the loss by fire of the leased premises here involved and paid the loss. It intervened in the action and participated in the trial seeking recovery of its payment from defendant. But after hearing, the trial court refused its request to be made a party to the judgment and it acquiesced. It has participated through counsel, as it had a right to do, in defending the judgment on this appeal and has been heard and its contentions considered. No order is here entered in respect to it.
 
 
 
 Notes:
 
 
 [1]
 A copy of the lease was attached to the complaint showing on its face that it excepted the tenant from obligation to the landlords for "loss by fire." The captions are set forth and the provisions are included or omitted as follows:
 "Lease.
 "Parties. This indenture, made in duplicate this 1st day of November, 1946 by and
 between Char-Gale Manufacturing Company, a Minnesota Corporation,
hereinafter designated and referred to as Lessor, and General Mills Inc., a Delaware
Corporation, with offices in the Hodgson Building, Minneapolis, Minnesota, hereinafter
designated and referred to as tenant,

"Witnesseth: That said Lessor in consideration of the rents and covenants hereinafter
mentioned, to be paid and performed by said Tenant, does hereby demise, lease and let
unto the said Tenant, and the said Tenant does hereby hire and take from the said
Lessor, the following described premises situate in the City of Minneapolis, County of
Hennepin, State of Minnesota, to wit:

"Description Lots Three (3), Four (4), Five (5), Six (6), and the Northwesterly
 of Thirty-six Feet (36') of Lot Seven (7) Block Three (3), Griswold's 3rd
 Premises. Addition, known and numbered as 3127 Hiawatha Avenue, and the vacated
 alley.

"Term. To Have and To Hold the above premises just as they are, without any
 liability or obligation except as hereinafter provided, on the part of said
Lessor of making any alterations, improvements or repairs of any kind on or about
said premises or the building or buildings of which they are a part, or the equipment,
fixtures, plumbing, appliances or machinery in, upon or serving same, or the streets,
alleys, areas, area-ways or passages adjoining or appurtenant thereto, for the term of
ten years from and after the 1st day of January 1947, to the first day of January 1957,
both dates inclusive, for the following purposes and for no other purposes, to wit:

"Nature of For general manufacturing, warehouse and office purposes.
Occupancy.

"Rent. And the said Tenant agrees to and with said Lessor to pay the Lessor
 as cash rent for the above mentioned premises the sum of One Hundred
Fifty Thousand Dollars ($150,000.00) in quarterly payments of Three Thousand Seven
Hundred Fifty ($3,750.00), payable in advance on the first day of January, April, July
and October of each year for and during the full term of this lease, at the office of
Lessor, in Minneapolis, Minnesota.

"As and for an additional rental for said premises, Tenant agrees to pay all real
estate taxes assessed against the premises payable during the term of this lease commencing
with the 1946 taxes payable in the year 1947 and including the 1955 taxes payable
in 1956. * * *

"Tenant to The said Tenant also covenants and agrees with the Lessor as follows:
Maintain That the Tenant will keep at its own expense said demised premises
Surrender and the equipment, plumbing, drains, fixtures, appliances and machinery
Premises in, upon, serving or appurtenant to said demised premises, in good repair
in Good and in good sanitary condition during said term, and that it will replace
Order. at its own expense promptly any and all glass broken in or about said
 premises with glass of the same quality; and that it will not use or
permit anything upon said premises that will increase the rate of insurance thereon,
or anything that may be dangerous to life or limb, and that it will not in any manner
deface or injure said demised premises, or any part thereof, or overload the floors, or
do or permit anything to be done upon said premises or in the passage-ways, alleys,
areas, area-ways, sidewalks or streets adjacent thereto, that will amount to or create
a nuisance; and that it will not use said premises or permit the same or any part
thereof to be used for lodging or sleeping purposes, or for any purpose contrary to the
laws, ordinances or regulations of the United States of America or the State of Minnesota,
or the City of Minneapolis, or of any rules or regulations of the City of Minneapolis,
or of any boards or officers of said city; and the Tenant agrees to return said
premises peaceably and promptly to the Lessor at the end of the term of this lease,
or at any previous termination thereof, in as good condition as the same are now in
or may hereafter be put in, loss by fire and ordinary wear excepted.

"Ice and Omitted.
Snow.

"Signs. Omitted.

"Condition Omitted.
 of
 Premises.

"Sub-Leasing. Omitted.

"Bankruptcy. Omitted.

"Liability The Tenant further agrees that the Lessor shall not be liable for any
of Lessor damage, either to person or persons or property or the loss of property
and Tenant. sustained by the Tenant, or by any other person or persons due to the
 demised premises or the building of which the demised premises are a
part, or the equipment, fixtures, appliances or machinery in or upon the same, or the
halls, passages, areas, area-ways and sidewalks or streets adjoining or appurtenant
to the same being or becoming out of repair or defective, or due to the happening of
any accident, or due to any act or neglect of the Tenant, or any Tenant or occupant
of said building, or of any other person, persons or corporations, or by the bursting of
pipes, or by the use or misuse of any instrumentality or agency in or connected with
the demised premises or the building of which it is a part, or occasioned by any nuisance
made or suffered thereon or therein, provided, however, that this provision shall not
apply to any damage resulting from the failure of Lessor to keep the roof and outside
walls of the buildings in repair.

"Liability The Tenant assumes all liability and obligation on account of all damages
of on account of the matters and things above referred to, and agrees to
Lessor and save the Lessor harmless thereon and therefrom, and to indemnify the
Tenant. Lessor on account thereof. This provision shall apply especially, but not
 exclusively, to damage caused by water, snow, rain, hail, backing up of
water mains or sewers, frost, steam, sewage, illuminating gas, sewer gas, or odors,
electricity and electric current, and by the bursting, stoppage or leaking of pipes or
radiators, plumbing, sinks, and fixtures in or about the demised premises or the building
of which the demised premises are a part. In case of such damage the Lessor
may at his option repair such damage, and if such damage has occurred in the demised
premises against which the Tenant has agreed to make repairs, the Tenant shall thereupon
reimburse the Lessor for the costs of repairing such damage, and if the Tenant
fails to perform any of the covenants or agreements herein provided to be kept or
performed by the Tenant, the Lessor may perform the same and charge the Tenant
with the expense of such performance, and the Tenant agrees promptly on demand to
repay the Lessor the cost of such performance by the Lessor.

"Notice to Omitted.
Clean
Premises.

"Tenant to Omitted.
Comply with
City Regulations.

"Taking for Public Omitted.
Use.

"Destruction It is further agreed between the Lessor and the Tenant that if during
by the term of this lease the demised premises or the improvements thereon
Fire. shall be injured or destroyed by fire or the elements, or through any
 other cause, so as to render the demised premises unfit for occupancy,
or makes it impossible to conduct the business of the tenant thereon, or to such an extent
that they cannot be repaired with reasonable diligence within thirty (30) days
from the happening of such injury, then the Lessor may terminate this lease and the
term herein demised from the date of such damage or destruction, and the Tenant
shall immediately surrender the demised premises and all interest therein to the
Lessor, and the Tenant shall pay rent only to the time of such surrender; and in case
of any such destruction or injury the Lessor may re-enter and repossess the demised
premises discharged of this lease, and may dispossess all parties then in possession
thereof. But if the demised premises can be restored within sixty (60) days from the
happening of the injury thereto, and the Lessor within fifteen (15) days from the occurrence
 of such injury elects in writing to so repair or restore said
"Repair of premises within sixty (60) days from the happening of the injury thereto,
 Premises then this lease shall not end or terminate on account of such injury
 After by fire or otherwise, but the rent shall not run or accrue after the
 Fire. injury and during the process of repairs, and up to the time when the
 repairs shall be completed, except only that the Tenant shall during
such time pay a pro rata portion of such rent apportioned to the portion of the demised
premises which are in condition for occupancy or which may be actually occupied during
such repairing period. If, however, the demised premises shall be so slightly injured
by any cause aforesaid, as not to be rendered unfit for occupancy, then the Lessor shall
repair the same with reasonable promptness, and in that case the rent shall not cease
or be abated during such repairing period. All improvements or betterments placed by
the Tenant on the demised premises shall however, in any event, be repaired and replaced
by the Tenant at his own expense and not at the expense of the Lessor.

"Quiet Omitted.
Enjoyment.

"Liens Omitted.
for
Alterations.

"Right Omitted.
of
Re-entry.

"Subleasing. Omitted.

"Termination Omitted.
of
Lease Under
Bankruptcy.

"Lien on Omitted.
Fixtures.

"Consent Omitted.
for
Alterations.

"Spur Omitted.
Track.

"Certain Omitted.
Equipment.

"Execution This lease, which is dated the first day of November 1946, is executed by
by General Mills, Inc., as Tenant upon condition that it shall be valid and
Lessor. remain in force and effect only if it be executed and acknowledged on or
 before November 20, 1946 by a Lessor then having in the opinion of
 Counsel for Tenant, good and merchantable title to the premises herein
 described. * * *

"Holding Omitted.
Over.

"Right of The Lessor shall at all times have the right to enter upon said premises
Entry. to inspect their condition, * * *.

 "Lessor hereby grants to Tenant an option to purchase the above described
 premises at the end of the term of this lease for the sum of One Hundred
 Seventy Thousand Dollars ($170,000.00) in cash provided * * *.

"Heirs Omitted.
and
Others.

"There are no understandings or agreements outside of this lease. * * *"
 
 
 [2]
 The jury responded to inquiries propounded to it as follows:
 "Interrogatory No. 1: Was the defendant, through its employee or employees, guilty of negligence in placing the aluminum casting pot in the sump of the Bullard machine at 3127 Hiawatha Avenue on January 15, 1948?
 "Answer `Yes' or `No': Yes.
 "Interrogatory No. 2: Was such negligence a proximate cause of the fire which destroyed the building at 3127 Hiawatha Avenue on January 15, 1948?
 "Answer `Yes' or `No': Yes.
 
 
 [3]
 As the Supreme Court of Minnesota puts it in Commercial Union Assurance Co. v. Foley Bros., 141 Minn. 258, 169 N.W. 793, 794, "Fires * * * spring ordinarily from negligence in some form * * * from the failure of some one to exercise necessary precautions to avoid the same."
 SANBORN, Circuit Judge (dissenting).
 Had I been the District Judge before whom this case was tried, I am satisfied that my rulings upon the questions presented at the trial would not have differed from those which are challenged by this appeal. After the case was submitted to this Court, I prepared an opinion stating my views as to the facts, the questions for review, and the applicable law. This opinion was no more convincing to my associates than their opinion is to me. Rather than attempting a dissection and criticism of the majority opinion, I prefer to submit as my dissent the opinion prepared by me, showing how I believe the case should be decided. The opinion follows:
 This appeal challenges the validity of a judgment for the plaintiff, Harry Goldman, in an action brought by him against General Mills, Inc., a tenant, upon the claim that it had negligently destroyed a building upon premises which it had leased.
 The litigation is the outgrowth of a fire which on January 15, 1948, destroyed the building on property known as 3127 Hiawatha Avenue in the city of Minneapolis, Minnesota, occupied by General Mills, Inc., under a written lease. At the time of the fire the property was owned by Harry Goldman, Charlotte Goldman, Irving H. Green and Faye Bettye Green. They had purchased it from the Char-Gale Manufacturing Company for $110,000. That company had, on November 1, 1946, leased the property to General Mills, Inc., for ten years from January 1, 1947, for manufacturing, warehouse, and office purposes, at a net annual rental of $15,000. The interest of the Char-Gale Manufacturing Company in the lease had been acquired by Harry Goldman and his co-owners.
 General Mills, Inc., as lessee, was in sole possession of the property when the fire occurred.
 The Indiana Lumbermens Mutual Insurance Company, of Indianapolis, Indiana, had issued to Harry Goldman and his associates a Minnesota Standard fire insurance policy against loss or damage to the building to the extent of $100,000, and against loss of rents to the amount of $15,000. After the fire, the insurance company paid to the insured owners $110,643.90 to cover the loss of the building and rentals.
 The owners of the property attributed the fire to the negligence of employees of General Mills, Inc., Harry Goldman's co-owners assigned to him their claims against General Mills, Inc. The insurance company, under the subrogation clause of its policy, received from the owners an assignment of their rights to recover from General Mills, Inc., what the insurance company had paid to them under the policy.
 Harry Goldman, who is a citizen of Louisiana, then brought this action against General Mills, Inc., a Delaware corporation, to recover $342,500 damages for the destruction of the building, allegedly caused by the actionable negligence of the defendant (appellant). The damages claimed included: (1) the diminution of the value of the property resulting from the fire, (2) the expense of removing debris, and (3) the loss of rentals under the lease.
 The defendant, in its answer, denied liability, and asserted that the destruction of the building rendered the premises untenantable and terminated the lease; that the defendant surrendered the leased property to the owners, who re-entered the premises; that, by the terms of the lease, the defendant was exonerated from all liability for the destruction of the building; that the loss sustained by the owners did not exceed the insurance on the building, which had been paid to them; that they had assigned their claims against the defendant to the insurance company, and that it was the real party in interest.
 The Indiana Lumbermens Mutual Insurance Company, as assignee and subrogee of the owners, filed a complaint in intervention, asserting that the fire was due to the negligence of the defendant, and asking for judgment against it for $110,643.90, the amount which the insurer had paid to its insureds. In answer to the complaint in intervention, the defendant set up substantially the same defenses it had asserted in its answer to the plaintiff's complaint.
 The case was tried to a jury. The controverted issues of fact were, as is usual in negligence cases, (1) liability, and (2) damages.
 The evidence of the plaintiff and the intervener tended to prove that the fire was caused by an employee of the defendant placing a hot aluminum casting of a pot of a pressure-cooker in the sump of a Bullard machine (a large mechanical device used for finishing the inside of such pots) under a flow of cutting oil or coolant flowing from the machine into a sump. The evidence of the defendant was to the effect that the fire was not, and could not have been, caused in that way.
 At the close of the evidence, the defendant made a motion for a directed verdict "on the ground that the plaintiff and the Intervener have wholly failed to make out a case of negligence; and for the further reason that the lease provisions exonerate the defendant from any liability in this case, even if negligence were shown." This motion was denied.
 In submitting the issues of fact to the jury, namely, those of negligence, proximate cause, and damages, the court directed the jury to answer special interrogatories and also to return a general verdict. The special interrogatories and the answers thereto are set forth in the margin.[1] The general verdict was in favor of the plaintiff for $198,678.
 The defendant made a motion for judgment notwithstanding the verdict or for a new trial. The court denied the motion for judgment, upon the grounds (1) that the evidence amply sustained the jury's finding that the defendant was negligent and that such negligence was the proximate cause of the destruction of the building in suit, and (2) that the terms of the lease did not relieve the defendant from liability for negligently destroying the building. The court concluded, however, that in submitting the case to the jury a wrong measure of damages had been used; that the proper measure of damages was the difference between the fair and reasonable market value of the property subject to the lease, immediately before the fire and its fair and reasonable market value immediately after the fire and before the debris was removed. A new trial was granted, limited to the issue of damages only, under authority of Rule 59(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.
 At the time the issue of damages came on for retrial, the parties stipulated that if that issue were to be submitted to a jury, its verdict would be in favor of the plaintiff for $142,500. The stipulation reserved to the parties their rights to review on appeal to the same extent as though evidence had been taken and the issue submitted to a jury. Judgment was then entered in favor of the plaintiff for $142,500. The intervener moved for a separate judgment in its favor against the defendant. The District Court denied this motion on the ground that the judgment entered, although in the plaintiff's name, was, in effect, one in trust for the intervener to the extent of its interest, and that there was no necessity for entering two judgments against the defendant.
 While the defendant in its "Statement of Points to be Argued," does not state specifically the errors of the District Court relied upon for reversal, it is a simple matter to determine the rulings which the defendant contends were erroneous.
 The defendant asserts that the court erred in refusing to direct a verdict for the defendant on the grounds: (1) that the exception "loss by fire" appearing in the covenant of the lease providing for the surrender of the leased premises in good condition, included a fire negligently caused by the defendant or its employees and exonerated the defendant from liability; and (2) that the evidence was insufficient to make the issue of actionable negligence one of fact for the jury. The defendant also contends that the court erred in refusing to limit the plaintiff's recovery to the difference between what the owners of the property received by way of insurance and the total award of damages; that the court's instructions to the jury were confusing; and that the court abused its discretion in failing to grant a new trial as to all issues.
 The applicable substantive law is that of Minnesota. The first question for consideration is whether the covenant of the lease which contained the provision that "the Tenant agrees to return said premises peaceably and promptly to the Lessor at the end of the term of this lease, or at any previous termination thereof, in as good condition as the same are now in or may hereafter be put in, loss by fire and ordinary wear excepted,"[2] was intended to relieve the defendant from liability for damages in case it or its employees, negligently destroyed the building by fire. The District Court was of the opinion that the quoted words, when read in connection with the other provisions of the covenant of the lease and considered in relation to the public policy that those who commit negligent acts are to be held responsible for the results of such acts, did not disclose an intention on the part of the lessor to relieve the lessee from liability for a negligent destruction of the building by fire. Concededly, there is no Minnesota case holding that a covenant such as that here involved has the effect which the defendant asserts should be given to it.
 It seems to me that the covenant to surrender the premises in good condition, "loss by fire and ordinary wear excepted," reasonably may not be construed to relate to the lessee's tort liability, but only to its contractual liability to make repairs or rebuild in case of the destruction of the building by fire. Apparently the reason for inserting exceptions, such as those here involved, in surrender clauses of leases was to relieve a tenant, who had agreed to keep the premises in repair, from any contractual liability to repair or rebuild structures injured or destroyed by fire or from having to answer in damages measured by the reproduction cost of such structures.
 The obligation of a tenant whose lease unqualifiedly requires him both to repair and to surrender the leased premises in good condition is outlined in United States v. Bostwick, 94 U.S. 53, 65-69, 24 L.Ed. 65. See, also, Warner v. Hitchins, 5 Barb., N.Y., 666, 668.
 Justice Mitchell, speaking for the Supreme Court of Minnesota in Harris v. Corless, Chapman & Drake, 1889, 40 Minn. 106, 108, 41 N.W. 940, 941, 2 L.R.A. 349, which involved a lease with a surrender clause which excepted destruction or injury by fire or the elements, said: "* * * We think that the language of the lease refers only to some sudden, unusual, or unexpected action of the elements occurring during the term, such as floods, tornadoes, or the like; extraordinary disasters, not anticipated by either party, the efficient cause of which originated after the term began, and which either destroyed the building, or left it in a materially and essentially worse condition than it was in when leased. We think this is substantially the sense in which such expressions in leases have always been used, and in which they would now be ordinarily understood by business men in executing such contracts. Fire is one of the elements in the same sense as water and wind are such; but inasmuch as fires, not from lightning, are usually caused by the intervention of human agency, there might be a question whether such damages were caused `by the elements,' and hence the word `fire' was added to the phrase which has formed a part of the `surrender' and similar clauses in leases almost from time immemorial. The effect of the intervention of human agency in producing the damage was the point upon which two courts differed in the cases of Polack v. Pioche, 35 Cal. 416 [95 Am.Dec. 115], and Van Wormer v. Crane, 51 Mich. 363, 16 N.W. 686 [47 Am. Rep. 582], — a question upon the discussion of which we have no occasion to enter."
 In Boardman v. Howard, 90 Minn. 273, 275, 96 N.W. 84, 85, 64 L.R.A. 648, 101 Am.St.Rep. 409, the Supreme Court of Minnesota said: "We have no doubt that the provision in the lease for the surrender of the premises by the tenants in as good condition as when received applies to the building itself. The exception relating to injury of the building by fire, while it would excuse the tenants from repairing or rebuilding, would not justify them in imposing burdens upon the landlord arising strictly from the tenants' occupancy and use of the premises; hence the injury by fire to the goods of defendants was a misfortune they had to assume themselves."
 The case of Wright v. Tileston, 60 Minn. 34, 37-38, 61 N.W. 823, 824, I think clearly indicates that a tenant's tort liability for negligence and carelessness causing damage to leased premises is something quite apart from the tenant's contractual liability to pay rent or make repairs, and that the exceptions contained in the conventional surrender clause of a lease do not exonerate the tenant from his tort liability, even though the damage is caused by one of the elements referred to.
 In 32 Am.Jur., Landlord and Tenant, § 783, page 669, it is said: "* * * A tenant is, however, liable for injury to his landlord from the destruction by fire of a building on the demised premises caused proximately by the tenant's negligence, even though the lease contains a provision that at the end of the term he shall yield possession `subject to loss by fire'"; — citing Brophy v. Fairmont Creamery Co., 98 Neb. 307, 152 N.W. 557, L.R.A. 1918A, 367, and Carstens v. Western Pipe & Steel Co., 142 Wash. 259, 252 P. 939. These cases unquestionably support the text.
 I think the case of Slocum v. Natural Products Co., 292 Mass. 455, 198 N.E. 747, upon which the defendant relies, is not controlling or even persuasive. That was a suit by the lessors against a lessee for a breach of a covenant in a lease "to make all repairs, both outside and inside usual or necessary to keep the demised premises in good repair and condition in every respect during the term of this lease, damage by fire or unavoidable casualty only excepted." The court said: "* * * We think the exception includes fires resulting from negligence of the lessee, and therefor in the popular sense `accidental.' It does not necessarily follow that the lessor would have no action in tort for the damage sustained." The case, therefore, clearly does not hold that the exception in the covenant of the lease exonerated the lessee from tort liability.
 But even if the question of the asserted exoneration of the defendant under the exception "loss by fire" in the surrender clause of the lease were doubtful — which I think it is not — this Court should accept the views of the District Court as to that question of local law. Magill v. Travelers Insurance Co., 8 Cir., 133 F.2d 709, 713; Doering v. Buechler, 8 Cir., 146 F. 2d 784, 788; Russell v. Turner, 8 Cir., 148 F.2d 562, 564; Mast v. Illinois Central R. Co., 8 Cir., 176 F.2d 157, 163; Northern Liquid Gas Co. v. Hildreth, 8 Cir., 180 F.2d 330, 336.
 In determining whether there was any substantial evidence upon which the verdict for the plaintiff could properly be based, this Court must assume as established all of the facts that the evidence supporting the plaintiff's claim reasonably tended to prove; give to him the benefit of all favorable inferences fairly deducible from such facts; and adhere to the rule that issues which depend upon the credibility of witnesses and the effect or weight of evidence are for the jury. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Svenson v. Mutual Life Insurance Co. of New York, 8 Cir., 87 F.2d 441, 442, 443; Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 439.
 A detailed analysis of the entire evidence in this opinion would not be justified. The parties are familiar with it, and the record has been carefully read and considered.
 Just before the fire occurred, George Ojala, a foreman of the defendant, had placed a hot aluminum casting of a pot for a pressure-cooker in a sump under the flow of cutting oil or coolant running from a Bullard machine into the sump. The Bullard machine is a large turret lathe about 8 feet high and 6 feet across, operated by two electric motors, one on top to drive the cutting tools, and another motor to keep the oil circulating through the machine and over the tools and the work in process. The machine involved was being used to finish the interior of the castings of the pots of pressure-cookers. The cutting oil or coolant used in the machine was a mixture of Vacmul B-1 (oil) and kerosene. The machine held about 150 gallons of this oil mixture. While the machine was in operation the oil circulated through it into the pots and over the cutting tools, and then flowed from the machine "like a waterfall," about a quarter of an inch thick and about 20 inches wide, through a screen, into the sump tank. The oil circulating through the machine would get warm, but not hot. There was oil on the floor around the machine, and oil had splashed onto the ceiling, which was about 4 inches from the motor on top of the machine.
 At the time the fire occurred, the machine operator was Clifford Abbott. He testified, on behalf of the plaintiff, that on the day of the fire, Charles Brantingham, Superintendent of the plant, and George Ojala were in the foundry, trying to pour some good pots in the molding machine by pouring molten aluminum alloy into the mold; that, shortly before the fire, he (Abbott) "saw George [Ojala] coming and he had a pot in his hand and he had these big, heavy asbestos gloves on, or mitts, on, whatever it was, and he come over there and walked right behind me with this pot and set it down here in the sump, right under this flow of kerosene; and she smoked for a little while, about a second or a second and a half, and after that she took hold"; that cutting fluid was pouring into the pot, and there was about a half inch of cutting fluid in the bottom of the sump; that after George put the pot in the sump, he walked away; that "At first there was a kind of grayish white smoke [something like steam or like a vapor] that occurred, and then about a second later, or a second and a half it just went poof — not loud or nothing but enough to ignite and take hold"; that it started to burn on top of the pot and kept going up the aluminum shavings until it got all around; that he (Abbott) saw the fire on top of the pot traveling into the Bullard machine; that the fire "kept eating on the oil outside of the Bullard and the first thing you know it was hitting the ceiling"; that it was about a minute and a half from the time the fire appeared on the top of the hot pot until the entire machine was afire; that when he (Abbott) saw the smoke from the pot, he stepped back because he had a feeling that something was going to happen; that he had said to George Ojala, "George, what the hell are you doing?" and that George said, "I am not doing nothing," although Abbott testified later that George said that he wanted to cool the pot off. Abbott also testified that he did not know whether there was more kerosene in the cutting oil than usual on the day of the fire, and that he had worked on the Bullard machine for more than three months and had not had any trouble or any fire.
 Charles Brantingham, the superintendent of production, who was called for cross-examination by the plaintiff, testified that the placing of hot pots in the sump of the Bullard machine was abnormal; that he had never heard of its being done before; that such castings came out of the mold at a temperature of about 800 degrees; that, under normal operations, the casting was put on a conveyor which took it through a casting cooler where it was cooled by water in the form of a fog, so that it could be handled before "the gates and risers" were sawed off and the pot polished; that the cooling unit was not in operation the day of the fire, but was hooked up and could have been started by pushing a button; that he and George Ojala were in a hurry to test the recently molded castings; that the casting which allegedly caused the fire was one of several recently taken from the mold; that he (Brantingham) did not see what Ojala did with the casting; that Ojala was carrying it with asbestos gloves; that he afterwards told Brantingham that he (Ojala) had set down the casting in the sump under the flow of cutting oil; that the screen on top of the sump would at all times be covered with a substantial amount of oil and scraps of aluminum.
 The testimony of George Ojala as to what happened when he put the hot pot under the flow of cutting oil did not vary greatly from that of Clifford Abbott. On direct examination, Ojala testified that he held the pot under the largest stream of oil for a second or two until it was about half full, and then set it in the sump right under the stream; that he did this to cool the pot quickly; that after he placed the pot in the sump he walked away about 15 or 20 feet and was standing there for a few minutes, and all of a sudden the Bullard machine was enveloped in flames. On cross-examination, he admitted that two days after the fire, in a statement given to an Arson Squad investigator, he had said: "I then set the pot down to cool off in the sump, under the flow of oil and stepped away from the machine, then there was `poof' and the fire enveloped the Bullard." He testified at the trial that it was at least 30 seconds after he put the hot pot in the sump before the fire started.
 A qualified expert, who testified on behalf of the plaintiff, gave it as his opinion that the fire was started by the placing of the hot pot under the stream of oil from the Bullard machine.
 While the defendant, by experiment and the testimony of experts, demonstrated convincingly (but not conclusively, I think) that a hot pot, at almost any temperature, could be placed under the flow (from a similar Bullard machine) of cutting oil or coolant of the same kind and quality as that which was in use on the day of the fire, and that the accused pot could not have been hot enough to have spontaneously started a fire, I agree with the trial court that the plaintiff's evidence made a prima facie showing which entitled him to have the issues of negligence and proximate cause submitted to the jury.
 "* * * Where uncertainty as to the existence of negligence arises from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury." Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720; St. Louis-San Francisco Railway Co. v. Passmore, 8 Cir., 177 F.2d 550, 551.
 I think that one reasonably can believe that the accused pot was too hot for the coolant or that the coolant was too temperamental for the pot, or that the inflammable vapor caused by putting the pot in the coolant was an unsafe substance to have in close proximity to a machine with two electric motors in operation. Concededly, what Ojala did was unusual, abnormal, and not good machine-shop practice. Whether what he did constituted actionable negligence was for the jury to decide.
 There was nothing confusing or inaccurate about the court's instructions to the jury on the issue of liability. The burden of proving negligence and proximate cause was placed squarely upon the plaintiff. After charging the jury with respect to those issues, the court said:
 "You will understand that you will not arrive at any question of damages until you have first determined the other questions which I have submitted to you.
 "However, if you arrive at the question of damages and if you find that plaintiff is entitled to recover under the instructions of the court, then plaintiff is entitled to recover the damages he sustained as a direct result of the negligence of the defendant."
 In instructing the jury upon the question of damages and the right of the plaintiff to recover, as a part thereof, the present value of future rentals provided in the lease, the court referred to a Minnesota statute, Sec. 504.05, Minnesota Statutes Annotated, which relieves a tenant of liability for rent if a leased building is destroyed without fault or neglect on his part; and advised the jury, in substance, that, in order to avoid liability for damages based on the value of future rentals under the lease, the burden was upon the defendant to show that the building was destroyed without fault or neglect on its part. This instruction related solely to the issue of damages, and the written interrogatories submitted to the jury so indicated.
 Unless the jury was incapable of understanding plain language — which we certainly may not assume and which seems to be negatived by the answers to the interrogatories, — the jurors could not have believed that they were justified in finding the defendant guilty of actionable negligence unless the defendant had proved that the contrary was true.
 I am satisfied that the court did not err in its instructions on the issue of liability, and was justified in limiting the new trial to the issue of damages alone. See Rule 59(a), Federal Rules of Civil Procedure, 28 U.S.C.A.; May Department Stores Co. v. Bell, 8 Cir., 61 F.2d 830, 842-843; Olson v. Hiel, 8 Cir., 177 F.2d 552, 554.
 I think the defendant's contention that it is entitled to have the benefit of the insurance collected by the owners of the property, and that the insurer has no recourse, is without merit. There was nothing in the lease that required the owners to carry insurance for either their own benefit or that of the defendant. There was no trust relationship existing between the owners and the defendant, and no privity of contract between defendant and the insurer. The policy which the insurer issued was upon a Minnesota Standard form prescribed by statute, Sec. 65.01, Minnesota Statutes Annotated. Upon payment of the loss, the insurer, by the terms of the subrogation clause of the policy, see Sec. 65.01, Minn.Stat.Ann., acquired by assignment, to the extent of the amount which it had paid in satisfaction of its policy liability, the rights of its insureds against the defendant. If the defendant was negligent, as the jury found it was, it became indebted to the owners of the leased premises, on the day the building was destroyed, to the extent of $142,500, regardless of whether the building was then covered by insurance or not. That the insurer is entitled to recoup its loss out of what the defendant owes the plaintiff for having negligently destroyed the insured building, is, in my opinion, of no legal concern to the defendant. Evans v. Chicago, Milwaukee & St. Paul Railway Co., 133 Minn. 293, 158 N.W. 335, 336.
 The judgment appealed from should be affirmed.
 Notes:
 
 
 [1]
 (Special Interrogatories submitted to Jury and Answers thereto)
 "Interrogatory No. 1: Was the defendant, through its employee or employees, guilty of negligence in placing the aluminum casting pot in the sump of the Bullard machine at 3127 Hiawatha Avenue on January 15, 1948?
 "Answer `Yes' or `No': Yes.
 "If the answer to Interrogatory No. 1 is `Yes', then answer:
 "Interrogatory No. 2: Was such negligence a proximate cause of the fire which destroyed the building at 3127 Hiawatha Avenue on January 15, 1948?
 "Answer `Yes' or `No': Yes.
 "If the answer to Interrogatory No. 2 is `Yes,' then answer:
 "Interrogatory No. 3: What was the fair and reasonable market value of the premises at 3127 Hiawatha Avenue immediately before the fire on January 15, 1948?
 "$135,000.00.
 "Interrogatory No. 4: What was the fair and reasonable market value of the premises at 3127 Hiawatha Avenue immediately after the fire on January 15, 1948, and after the debris had been removed?
 "$15,000.00.
 "Interrogatory No. 5: What was the fair and reasonable net cost of removing the debris from the premises at 3127 Hiawatha Avenue immediately after the fire on January 15, 1948?
 "$3678.00.
 "The following interrogatories pertain to plaintiff's claim for the present value of the rent due and owing under the lease for the balance of the full term thereof, less the reasonable rental value of the vacant lots for the balance of said lease:
 "Interrogatory No. 6: Has the defendant established that the building at 3127 Hiawatha Avenue was destroyed by fire without fault or neglect on its part?
 "Answer `Yes' or `No': No.
 "If Interrogatory No. 6 is `No,' then you will answer:
 "Interrogatory No. 7: What is the present value of the rent due and owing under said lease for the remaining term thereof less the reasonable rental value of the vacant lots for the balance of said term?
 "$75,000.00.
 "Dated this 30th day of October, 1948.
 "Harold J. Downer,
 "Foreman of the Jury."
 
 
 [2]
 The entire covenant reads as follows:
 "The said Tenant also convenants and agrees with the Lessor as follows: That the Tenant, will keep at its own expense said demised premises and the equipment, plumbing, drains, fixtures, appliances and machinery in, upon, serving or appurtenant to said demised premises, in good repair and in good sanitary condition during said term, and that it will replace at its own expense promptly any and all glass broken in or about said premises with glass of the same quality; and that it will not use or permit anything upon said premises that will increase the rate of insurance thereon, or anything that may be dangerous to life or limb, and that it will not in any manner deface or injure said demised premises, or any part thereof, or overload the floors, or do or permit anything to be done upon said premises or in the passage-ways, alleys, areas, area-ways, sidewalks or streets adjacent thereto, that will amount to or create a nuisance; and that it will not use said premises or permit the same or any part thereof to be used for lodging or sleeping purposes, or for any purpose contrary to the laws, ordinances or regulations of the United States of America or the State of Minnesota, or the City of Minneapolis, or of any rules or regulations of the City of Minneapolis, or of any boards or officers of said city; and the Tenant agrees to return said premises peaceably and promptly to the Lessor at the end of the term of this lease, or at any previous termination thereof, in as good condition as the same are now in or may hereafter be put in, loss by fire and ordinary wear excepted."