## PETTIT GRAIN & POTATO COMPANY v. NORTHERN PACIFIC RAILWAY COMPANY.[1]

December 3, 1948.

No. 34,704.

[1]Reported in 35 N. W. (2d) 127.

226

*Bradford & Kennedy*, for appellant.

*L. B. daPonte, Reginald Ames*, and *Hugh G. Parker*, for respondent.

PETERSON, JUSTICE.

This action was brought to recover the value of plaintiff's warehouse and contents destroyed on March 28, 1946, by a fire caused by sparks emitted from one of defendant's locomotives while it was hauling a freight train.

The questions for decision are:

(1) Whether a building situated upon a railroad right of way at the time of the execution of a lease between the railroad company and the owner of the building is covered by a clause in the lease reciting that it was understood by the parties that the leased premises were in dangerous proximity to the railroad tracks, and that the property thereon would be in danger of injury or destruction by fire, and providing that the lessee accepted the lease subject to such dangers, and not only assumed all risk of, but also agreed to indemnify the lessor for, loss, damage, or destruction of "buildings or contents or to any other property brought upon or in proximity to the leased premises by the lessee," whether such loss was occasioned by fire or sparks from locomotives or other causes incident to or arising from the movement of the railroad's trains or in any respect from the operation of the railroad, or whether such loss or damage was the result of the negligence or misconduct of any of the railroad's employes or "of defective appliances, engines or machinery";

(2) Whether a provision in a lease of part of a railroad right of way is valid which exempts the railroad company as lessor from liability for damage to or destruction by fire of the lessee's property on the leased premises, whether caused by negligence or misconduct of the railroad company's servants or by defective appliances, engines, or machinery, where by statute requiring railroad companies to equip locomotives with good and efficient spark arresters a railroad company is subject to a penalty for violation thereof and the employe responsible for the violation is guilty of a misdemeanor.

(3) Whether statutes amending and supplementing prior statutes so as to provide for a more severe penalty against railroad companies for violation thereof, for more drastic criminal liabilities against certain railroad employes in such cases, for making railroad

companies also criminally liable in such cases, for absolute civil liability on the part of railroad companies for fires set by their locomotives instead of liability for negligence, and for authority to railroad companies to procure insurance to protect themselves against liability for such fires evince a public policy rendering invalid a bargain for such exemption from liability.

In 1919, defendant leased to plaintiff a part of its right of way upon which plaintiff's warehouse was then situated for the purpose of maintaining a potato warehouse. The clause here pertinent reads as follows:

"It is understood by the parties that the leased premises are in dangerous proximity to the tracks of the Railroad Company and that * * * property on the leased premises will be in danger of injury or destruction by fire or other causes incident to the operation of a railway, and the lessee accepts this lease subject to such dangers. It is therefore agreed, as one of the material considerations of this lease without which the same would not be granted, that the lessee assumes * * * all risk of loss, damage or destruction to buildings or contents or to any other property brought upon or in proximity to the leased premises by the lessee, or by any other person with the consent or knowledge of the lessee, without regard to whether such loss be occasioned by fire or sparks from locomotive engines or other causes incident to or arising from the movement of locomotives, trains or cars, misplaced switches or in any respect from the operation of a railway, or to whether such loss or damage be the result of negligence or misconduct of any person in the employ or service of the Railway Company, or the Director General of Railroads, or of defective appliances, engines or machinery. And the lessee shall save and hold harmless the Railway Company and the Director General of Railroads from all such damage, claims and losses."

There was evidence to show that plaintiff's warehouse and the contents thereof were destroyed by fire set by sparks emitted by one of defendant's locomotives while it was hauling an eastbound freight train of 60 to 80 cars; that in traversing a distance of about

90 miles before reaching plaintiff's warehouse some 10 or 12 grass fires had been set by sparks emitted by the locomotive; that the locomotive was equipped with a so-called "Cyclone" spark arrester, which had been installed about a year before the fire; that inspection immediately before and after the fire failed to reveal any defect therein; that a spark arrester of the type in question, if in good working order, complied with the requirements of the statute requiring locomotives to be equipped with a practical and efficient arrester; and that, if the spark arrester had been in good and efficient working condition, the locomotive would not have emitted sparks which caused the fires.

At the close of the testimony the trial court directed a verdict for defendant for the reasons that the warehouse was covered by the clause exempting defendant from liability for destruction thereof by fire and that thereunder defendant was exonerated from liability therefor.

■ A lease, the same as any other instrument, should be construed so as to ascertain and to give effect to the intention of the parties as expressed in the language used. Ordinarily, the language used should be given its commonly accepted meaning. No reason has been suggested why it should be otherwise here. Where, as here, the word "or" is used in separating the members of an enumeration, its effect is disjunctive and manifests a meaning that each member is separate and distinct. State ex rel. Shenk v. State Board of Examiners, 189 Minn. 1, 250 N. W. 353. Where, as here, the word "other" is used at the end of an enumeration to refer to another member thereof, it ordinarily means "in addition to and different from those [already] mentioned." Orme v. Atlas Gas & Oil Co. 217 Minn. 27, 13 N. W. (2d) 757; State ex rel. Smith v. C. M. & St. P. Ry. Co. 128 Minn. 25, 150 N. W. 172.

It is clear here that it was the intention of the parties to exempt defendant from liability to plaintiff for loss or damage to or destruction of the latter's property caused by the operation of the former's trains. That the word "buildings" includes those on the premises when the lease was executed is plain from the recital that "property

on the leased premises" will be in danger of destruction by fire. The reference is to property thereon, regardless of when it was placed there. The other language confirms this meaning. The disjunctive "or" in the phrase "all risk of loss, damage or destruction to buildings or contents or to any other property brought upon" the premises plainly refers disjunctively to each kind of property it separates as being distinct from the others. The words "any other" in the phrase "any other property" refer to property different from and in addition to that (buildings or contents) already mentioned. So construed, the exemption from liability in the clause in question refers to three classes of property, viz., *buildings* on the leased premises, regardless of when they were placed there; *contents* of any such building; and *additional and different* property which might be brought upon the leased premises by the lessee or by another with his consent. In short, the exemption-from-liability clause included plaintiff's warehouse upon the leased premises when the lease was executed.

The case of Frederick v. G. N. Ry. Co. 207 Wis. 234, 240 N. W. 387, 241 N. W. 363, 80 A. L. R. 984, cited by plaintiff, is not in point. The lease there construed differs from the one here involved, in that it covered only property *brought* upon the leased premises by the lessee or with his consent. It did not cover property upon the premises at the time the lease was executed, as the one here does. There, the court gave the words "brought upon" the leased premises a prospective operation, thereby excluding property upon the premises when the lease was executed. Here, the lease by its terms includes both property upon the leased premises when the lease was executed and that brought thereon afterward by the lessee.

■ Some phases of the question as to the extent which public policy permits a lessor and lessee to provide by lease for the former's exoneration from tort liability to the lessee have been settled by our decisions, and it is not necessary now to go over the ground again, except to state what has already been decided. A provision in a lease exempting the lessor from liability to the lessee for his own and his employes' negligence does not contravene any rule of

public policy and is valid. Weirick v. Hamm Realty Co. 179 Minn. 25, 228 N. W. 175. The rule applicable to railroad companies in similar cases is not different. A provision in a lease of part of a railroad company's right of way that the company shall be exempt from liability to the lessee for damage to or destruction by fire of property placed thereon by the lessee is valid. Commercial Union Assur. Co. Ltd. v. Foley Bros. 141 Minn. 258, 169 N. W. 793; James Quirk Milling Co. v. M. & St. L. R. Co. 98 Minn. 22, 107 N. W. 742, 116 A. S. R. 336. Briefly, the reasons given for the rule as applied to railroad right-of-way leases are that in making such leases the company acts not as a common carrier performing duties imposed upon it as such by law independent of contract, but rather as any other property owner; that a railroad company is not compelled by law to permit others to erect structures on its right of way; that in such cases the public interest is not affected one way or the other by whether the loss resulting from damage to or the destruction of the lessee's property shall fall on the company or the lessee; and that, since the company is under no obligation to grant such leases and since the public is not concerned about the incidence of such losses, the company may grant such leases upon the condition that the lessee shall assume the risk thereof. The rule applies as against a lessee who might have acquired by condemnation under the statutes (M. S. A. 230.01 to 230.11) the right to use part of the railroad's right of way for a *public* warehouse, but did not do so and instead took a lease. James Quirk Milling Co. v. M. & St. L. R. Co. *supra.* Parenthetically, it does not appear here that plaintiff operates a *public* warehouse as distinguished from a *private* one, and consequently it does not appear that it was entitled to acquire such right by condemnation.

Plaintiff, however, contends not only that in the cited cases the point was not raised that such a lease provision exonerates a railroad company from the consequences of a criminal act and that consequently the question was not decided, but also that, whatever public policy may have been when those cases were decided, statutes subsequently enacted manifest a public policy prohibiting such exoner-

ation of a railroad company from liability for fires set by sparks emitted from locomotives. True, the point has not been raised or decided under either the statutes in force when the Quirk case was decided or those subsequently enacted. The Commercial Union Assur. Co. case (141 Minn. 258, 169 N. W. 793) *supra,* was decided after statutes subsequent to the Quirk case became effective, but the statutes were held not to be applicable there. In Michigan Millers Mut. F. Ins. Co. v. C. N. Ry. Co. (8 Cir.) 152 F. (2d) 292 (affirming [D. C.] 58 F. Supp. 326), the question arose under the present statutes, to which reference will be made *infra,* but this precise point was not raised or decided. The cited case sustains the validity of such exemption-from-liability clauses in a lease of part of railroad right of way.

The Quirk case was decided in 1906. Statutes then in force (R. L. 1905, §§ 2037, 2041) provided that every railroad company should use upon each locomotive a good and efficient spark arrester; that any company violating this provision should forfeit to the state $100 for each offense; that any railroad employe violating this provision should be guilty of a misdemeanor and punished by a fine of not less than $5 and not more than $50; and that in any action for damage caused by fire scattered and thrown from railroad cars or engines the fact that fire was so scattered and thrown should be prima facie evidence of the company's negligence.

We do not deem it necessary now to define in detail the extent to which the consequences of criminal acts may be the legitimate subject matter of a bargain, but we think that reference to a few settled rules will indicate the limits beyond which no bargain can go. A bargain which involves the commission of a crime, either as a consideration therefor or in the performance thereof, is invalid as against public policy. Leuthold v. Stickney, 116 Minn. 299, 133 N. W. 856, 39 L.R.A.(N.S.) 231, Ann. Cas. 1913B, 405 (lease of building not equipped with fire escapes in violation of statute) ; Handy v. St. Paul Globe Pub. Co. 41 Minn. 188, 42 N. W. 872, 4 L. R. A. 466, 16 A. S. R. 695 (contract of employment which could be performed only by unlawfully conducting business on Sunday). The same is true of a bargain which tends to the violation of law.

Tedesco v. Maryland Cas. Co. 127 Conn. 533, 18 A. (2d) 357, 132 A. L. R. 1259 (bargain for indemnity against fines imposed for violation of statute making act criminal). There are, however, numerous situations in which a bargain for protection from the consequences of an illegal act have been sustained. A bargain for protection from the consequences of an illegal and criminal act is valid where neither the consideration therefor nor the performance thereof involves the commission of a criminal act or intentional participation therein; where it involves no violation of or attempted escape from performance of duty to the public or a third person imposed by law independent of contract; and where the illegal act is a remote and undesired one which might happen in the future without intentional participation of the parties. Fidelity & Cas. Co. v. Eickhoff, 63 Minn. 170, 65 N. W. 351, 30 L. R. A. 586, 56 A. S. R. 464 (fidelity insurance to indemnify employer for fraud or dishonesty of employes, including robbery, theft, larceny, and the like) ; Georgia Cas. Co. v. Alden Mills, 156 Miss. 853, 127 So. 555, 73 A. L. R. 408 (indemnity of employer for accidental injuries to third persons by employes which covered criminal assaults) ; Municipal Metallic Bed Mfg. Corp. v. Dobbs, 253 N. Y. 313, 171 N. E. 75, 68 A. L. R. 1376 (provision in lease whereby lessor agreed to indemnify lessee for any loss sustained as the result of the existence of any statute, ordinance, or restriction prohibiting the use for which the premises were leased). Automobile liability policies covering liability for the consequences of acts which are crimes have been uniformly sustained, but the grounds for such decisions are not uniform. In Taxicab Motor Co. v. Pacific Coast Cas. Co. 73 Wash. 631, 132 P. 393, and Tinline v. White Cross Ins. Assn. Ltd. [1921] 3 K. B. 327, decision was based upon the ground that such policies do not contravene public policy, in that their tendency is not to encourage the commission of crime, but rather to afford protection to the victims of accidents by enabling the insured to discharge his responsibility therefor. In Messersmith v. American Fidelity Co. 232 N. Y. 161, 133 N. E. 432, 19 A. L. R. 876, decision sustaining such insurance was rested upon the ground that legislative approval of such policies manifested a public policy

that they were legal. There are other situations where the need for protection from the consequences of criminal acts is obvious. Such a situation was presented in Goelet v. National Surety Co. 249 N. Y. 287, 164 N. E. 101, 62 A. L. R. 425, where a lessor-indemnitee was held entitled to recover under an indemnity clause in the lease against any loss sustained by reason of any failure or default in the observance of, and compliance with, federal prohibition laws. There, however, the point now under consideration was neither raised nor decided.

While no case has been cited holding that a bargain for exemption from liability for the consequences of an act made criminal by statute is valid, the cases cited above involving indemnity contracts show that public policy does not forbid bargains for protection from the consequences of such acts. Where a bargain for exemption from liability by a common carrier does not relate to duties imposed upon it by law independent of contract, the rule is that if a contract for indemnity against the exempted liability is lawful, so also is one for exemption from the liability. In Checkley v. Illinois C. R. Co. 257 Ill. 491, 100 N. E. 942, 44 L.R.A.(N.S.) 1127, Ann. Cas. 1914A, 1202, it was held that a lease provision exempting the railroad company as lessor from liability to the lessee of part of its right of way for loss caused by fire was valid. The court pointed out that such a provision did not lessen a public carrier's duty as such to the public and that, since a carrier might procure insurance to protect itself against the loss covered by the exemption clause, there was no reason why it should not do so directly by the clause in question. It said (257 Ill. 497, 100 N. E. 944):

"* * * If appellee had owned the warehouse and its contents in question it could have lawfully insured the same for its own benefit, and such insurance contract might have protected appellee from loss or damage caused by fire originating through the negligence of its servants. If such a contract, which is one of indemnity, merely, is valid, why may not appellee lawfully protect itself from damage arising from the same source by a stipulation with its tenant? There

appears to be no distinction, either upon reason or authority, for upholding the contract in one case and declaring it void in the other."

Public policy permits railroad companies to procure insurance to protect themselves against losses which might be sustained in the operation of their business. In M. St. P. & S. S. M. Ry. Co. v. Home Ins. Co. 64 Minn. 61, 66 N. W. 132, we upheld an insurance contract indemnifying a common carrier against loss occasioned by its negligence as such, upon the theory that such indemnity did not lessen the carrier's duty to the public imposed by law independent of contract, but, on the contrary, rather increased its means of meeting its responsibility for such negligence. In substance, insurance is simply an arrangement as to the incidence of loss whereby it is made to fall on the insurer rather than on the insured. The purpose of insurance is to protect the insured against loss. Exemption from liability is a form of such protection. There is no more objection to a bargain for exemption from liability than there is to one for indemnity against loss. As said in N. P. Ry. Co. v. Thornton Bros. Co. 206 Minn. 193, 197, 288 N. W. 226, 228:

"Neither law nor public policy prevents the ordinary contractor from buying from a third party indemnity from the pecuniary result of his own negligence. That is legitimate as insurance. How does the same process, with identical result, become illicit simply because they are those of the original and basic contract rather than a collateral one for conventional insurance?"

It was, therefore, permissible as a matter of public policy for a railroad company and a lessee of part of its right of way to stipulate in the lease for the former's exemption from liability for loss caused by fire set by its locomotives, even though such fire might be the consequence of acts of the railroad company's servants made criminal by statute. Such a lease provision does not stipulate for the commission of any criminal act or involve participation in one, nor does it tend to encourage such conduct. It does not provide for indemnity against punishment for the crimes of the company's servants or for the heavy penalty to which a company is subject for

violation of the statutes. Likewise, it has no tendency to lessen the company's performance of its duties as a common carrier; and, as we said in N. P. Ry. Co. v. Thornton Bros. Co. *supra* (206 Minn. 197, 288 N. W. 228), of negligent acts, the results of acts such as are here involved are so "onerous" and "altogether annoying" to a railroad company "that only the extreme of inexperience would harbor the thought that a contract of the instant sort would operate in the slightest degree as a premium on and so an inducement to" the commission thereof.

The text in 13 C. J., Contracts, § 437,[2] cited by plaintiff, and the case of Cooper v. N. P. Ry. Co. (D. C.) 212 F. 533, are contra. The text in C. J. cites Galveston, etc. Ry. Co. v. Pigott, 54 Tex. Civ. App. 367, 116 S. W. 841, involving an attempted exemption by a railroad company for negligence causing the death of one of its employes. A bargain for an employer's exemption from liability to his employe for negligence is invalid as opposed to public policy, for reasons germane to the master-servant relationship. Restatement, Contracts, § 575(1) (a). The case is not in point here. The Cooper case involved the validity of a lease provision identical with the one here involved. The court held the provision invalid so far as it related to exemption from the consequences of acts made criminal by statute as one tending to exempt from liability for a violation of law. As we have pointed out, such a lease provision, in our opinion, has no such tendency. We think that the weight of authority and reason is opposed to both the cited text and the Cooper case, and for that reason we decline to follow them.

What has been said concerning acts of defendant's employes also applies to the penalty provision against railroad companies.

Our conclusion on this phase of the case is that under the public policy in force under prior statutes a provision in a lease of the kind here involved exempting a railroad company from liability to its lessee for damage to or destruction of the latter's property by fire set by its locomotives is permissible as a matter of public policy and valid.

---

[2]See also 17 C. J. S., Contracts, § 262.

■ Our present statutes are those enacted in 1909 and afterward as amendatory of and supplementary thereto. In 1909, the legislature enacted the first of a series of statutes (L. 1909, c. 182) prescribing additional safeguards against fires and imposing upon railroad companies new responsibilities and liabilities, both civil and criminal, to achieve those purposes. This statute and those amendatory thereof and supplementary thereto constitute our present statutes. M. S. A. 88.01 to 88.78, and 219.57. The preamble to c. 182 recites that the Hinckley fire of 1894 and the Chisholm fire of 1908 are examples of the distress and injury resulting from fires and that "It will promote the public welfare to have safeguards for the prevention of such fires more strictly observed." Under § 88.21, subd. 11, every person operating a railroad is required to equip and use upon each locomotive a *practical* and efficient spark arrester constructed in conformity with §§ 88.02 to 88.21. Violation thereof subjects a railroad company to a penalty of $500 per day for each and every day it operates a "defective locomotive" within the state. Section 88.21, subd. 3, imposes upon the master mechanic or corresponding employe responsibility for the good condition of the spark arrester without in any way relieving the company from responsibility therefor, and provides that a violation thereof shall be a *gross misdemeanor.* Section 219.57 provides that a railroad company shall use upon each locomotive a *good* and efficient spark arrester; that the master mechanic shall cause it to be examined each time before leaving the roundhouse; that the master mechanic and the corresponding employe making the examination shall be held responsible for the good condition thereof, but without relieving the company from its responsibility therefor; and that a violation thereof by the company or an employe shall constitute a separate misdemeanor as to each, punishable as therein provided. Nine days after the enactment of c. 182, the same legislature enacted L. 1909, c. 378, which reads:

"Each railroad corporation owning or operating a railroad in this state shall be responsible in damages to every person and corpora-

.tion whose property may be injured or destroyed by fire communicated directly or indirectly by the locomotive engines in use upon the railroad owned or operated by such railroad corporation, and each such railroad corporation shall have an insurable interest in the property upon the route of the railroad owned or operated by it and may procure insurance thereon in its own behalf for its protection against such damages."

This statute now is § 219.76.

··The present statutes, so far as here material, made the following changes in our statutory law: (1) It is a misdemeanor for a railroad company to operate a locomotive not equipped with a practical (good) and efficient spark arrester (there was no such offense under prior statutes) ; (2) the offense of a master mechanic or corresponding employe for failing to see that a locomotive is so equipped is made a *gross misdemeanor* instead of a *misdemeanor;* (3) the amount of the penalty against a railroad company for each violation of the statute so far as it relates to equipping locomotives with spark arresters was increased from $100 to $500; (4) absolute civil liability for fires set by locomotives was substituted for liability for negligence[3]; and (5) giving railroad companies an insurable interest in property along their railroads and authorizing them to procure insurance for their protection against damage thereto by fire.

The process of determining whether the present statutes have effected a change in public policy rendering invalid such an exemption-from-liability clause involves simply a determination of whether the public policy manifested by present statutes with respect to such exemption from liability differs from that manifested by prior statutes, and, if so, whether it goes to the precise question now under

[3]Numerous cases hold that under § 219.76 the liability of a railroad company for fires set by its locomotives is absolute. Dumbeck v. C. G. W. R. Co. 177 Minn. 261, 225 N. W. 111; Carr v. Davis, 159 Minn. 485, 199 N. W. 237; Babcock v. C. N. Ry. Co. 117 Minn. 434, 136 N. W. 275, Ann. Cas. 1913D, 924. In Anderson v. M. St. P. & S. S. M. Ry. Co. 146 Minn. 430, 439, 179 N. W. 45, 49, we said that the statute "virtually makes railroad companies *insurers* against damage caused by fires set by their engines." (Italics supplied.)

consideration. For reasons to be presently stated, we think that present statutes have not effected any change in public policy rendering invalid such exemption from liability.

The change in the nature of the crime of the master mechanic or corresponding employe responsible for a violation of statute regarding spark arresters from a misdemeanor to a gross misdemeanor reflects a purpose to coerce responsible railroad employes to perform the duties the statute requires of them. It is silent as to the company's right to contract for exemption from civil liability for the consequences of such acts. It is aimed at the employes and not the company. It presents nothing new. It embodies the same public policy as the prior statute. Since an exemption-from-liability clause was valid under prior statutes, it also is under present statutes.

The provision of present statutes making a railroad company guilty of a misdemeanor for violation of the statute is new. That is aimed at railroad companies. When the true nature of the company's crime is considered, it becomes apparent that a bargain for exemption from civil liability from the consequences of such acts violates no rule of public policy. In substance, a bargain for such exemption is not different from exemption from civil liability for the act of a third person made criminal by statute in which the parties to the bargain did not intentionally participate. Any liability of a corporation for the acts of its servants which its governing authority has not commanded or directed is a vicarious one. It is held liable not for its own act, but for that of its servants. A corporation can act only through its servants. As we said in M. St. P. & S. S. M. Ry. Co. v. Home Ins. Co. *supra* (64 Minn. 69, 66 N. W. 135):

"The plaintiff is a corporation, and the negligence of a corporation must always be that of some agent or servant, and there can be no reasons of public policy why corporations ought not to be permitted to insure against liability due to such negligence."

In Porter v. Grennan Bakeries, Inc. 219 Minn. 14, 16 N. W. (2d) 906, we had occasion to consider the nature of the vicarious civil

liability of a master for his servant's torts and pointed out that such liability involves no personal fault on the master's part or participation by him in the servant's tort. We there said (219 Minn. 21, 16 N. W. [2d] 909):

"Under the doctrine of *respondeat superior,* according to the generally accepted view, vicarious liability to third persons is imposed upon the master for his servant's torts, not because the master is at fault, or because he authorized the particular act, or because the servant represents him, but because the servant is conducting the master's business, and because the social interest in the general security is best maintained by holding those who conduct enterprises in which others are employed to an absolute liability for what their servants do in the course of the enterprise. * * * Where the doctrine of *respondeat superior* is relied on as a basis for recovery by a third person, the tortious act of the servant committed in the scope of his employment, and not the master's fault or the absence of it in hiring or retaining the servant, is the basis of liability. The master is held liable for the servant's tort."

See, Penas v. C. M. & St. P. Ry. Co. 112 Minn. 203, 127 N. W. 926, 140 A. S. R. 470, 30 L.R.A.(N.S.) 627; Holmes, *Agency,* 4 Harv. L. Rev. 345. The doctrine of *respondeat superior* is so well established in our law that we do not stop to consider its real nature. We speak of the master's tort when what we mean is the master's liability for his servant's tort. The rule is the same in criminal cases. Where a corporation is made criminally liable for a crime committed by a servant, the liability is a vicarious one—the corporation is held liable not for its own, but for its servant's, crime. State v. Southern Ry. Co. 145 N. C. 495, 59 S. E. 570, 13 L.R.A.(N.S.) 966; Ohio Cas. Ins. Co. v. Welfare Finance Co. (8 Cir.) 75 F. (2d) 58. See, State v. Burns, 215 Minn. 182, 9 N. W. (2d) 518, where we had occasion to point out the difference in the development of the doctrine of *respondeat superior* in civil and criminal cases. The failure here of defendant to equip its locomotive with a practical and efficient spark arrester obviously was an act of omission on the part of its

employes charged with the duty of seeing that that was done. The statute making the company criminally liable for the omission of its master mechanic or corresponding servant "responsible" for the violation thereof recognizes this to be true. Defendant here had set up a system to secure performance of such duty. It provided for inspections and records thereof. So far as appears, these ordinarily. would have been adequate for the purpose. Defendant itself neither directed nor commanded the doing of any act in violation of the statute. Violation occurred notwithstanding its efforts to prevent it. It is plainly a case of its being held vicariously criminally liable for an act of its servants in which it in no way participated.

The change in the nature of a railroad company's liability for fire set by its locomotives from one for negligence to an absolute one manifests no change of public policy with respect to the question now under consideration. Such an exemption is valid where the liability is an absolute one imposed by statute irrespective of negligence. Sunlight Carbon Co. v. St. Louis & S. F. R. Co. (8 Cir.) 15 F. (2d) 802; E. L. Cleveland Co. v. B. & A. R. Co. 133 Me. 62, 173 A. 813; Annotations, 51 A. L. R. 638, 48 A. L. R. 1006, 44 L.R.A.(N.S.) pp. 1129-1130. See, Manchester Marble Co. v. Rutland R. Co. 100 Vt. 232, 136 A. 394, 51 A. L. R. 628. While present statutes changed the nature of a railroad company's liability, they simply substituted one rule under which the parties might stipulate for the company's exemption from liability for fires for another rule under which they could also do that very thing.

The fact that the amount of the penalty for a railroad company's violation of the statute was increased is not important in this connection. Since the changes in the criminal liabilities of railroad companies and their employes and the civil liability of railroad companies for damages caused by their violation of the statute regarding spark arresters do not manifest a change of public policy with respect to the question under consideration, the change in the amount of the penalty against a company for violation thereof does not do so either.

The provision in the present statute authorizing a railroad company to procure insurance to protect itself against liability for damage by fire set by its locomotives approves the public policy of permitting indemnity and exemption from liability in cases like the instant one. Extension of the right to insure property not on a railroad company's right of way shows the sweeping nature of the authorization. Under such a statute, the lessee's agreement to indemnify the railroad company for damage to or destruction of a third person's property placed on the leased premises with the lessee's consent is valid. Wabash R. Co. v. Ordelheide, 172 Mo. 436, 72 S. W. 684; Ordelheide v. Wabash R. Co. 175 Mo. 337, 75 S. W. 149. And since, as we pointed out, where the risk is one against which a railroad company may properly procure indemnity, there is no reason why it may not procure the equivalent in the form of exemption from liability by direct contract with its lessee rather than by a separate contract for indemnity with an insurance company, a provision in a lease having that effect violates no rule of public policy.

Our conclusion is that the exemption-from-liability clause violates no rule of public policy.

Affirmed.