Donald BRUBAKER, Appellant,

v.

HI–BANKS RESORT CORPORATION,
et. al., Respondents.

No. C2–87–444.

Court of Appeals of Minnesota.

Nov. 17, 1987.

Review Denied Jan. 28, 1988.

Barbara M. Louisell, Duluth, John D. Hagen, Jr., Minneapolis, for appellant.

Alfred J. Weinberg, Duluth, for respondents.

Heard, considered and decided by WOZNIAK, P.J., and FOLEY and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

In a special verdict in favor of appellant, the jury found the parties had entered into an oral agreement which added to the terms of the parties' written contract. The trial judge granted judgment notwithstanding the verdict and a conditional new trial to respondent on grounds the oral agreement was *in pari delicto* and alternate grounds of attorney misconduct. We reverse.

## FACTS

Donald Brubaker, plaintiff and appellant, and his wife Edith purchased the Hi–Banks Resort, near Duluth, in 1971. The property was a small deteriorated fishing resort and was purchased for $75,000. The couple invested more than $67,000 in improvements, and Donald Brubaker provided much of the physical labor. Edith Brubaker handled the finances; she is a high school graduate and had one year of college and Donald has only a seventh grade education.

Donald Brubaker is chronically ill with primary biliary cirrhosis, a degenerative illness, not caused by excess alcohol use. His illness became serious and reduced his ability to work in 1978. In August 1979, he underwent complex bypass surgery. The Brubakers decided to sell the resort.

The couple sold the resort to Edith Brubaker's son, Adrian Nelson, and his wife, Diane, effective April 1979. Nelson had no prospects for advancement at another job, and viewed the resort as a chance for him to "make a million."

The parties met with Andrew Larson, the Brubakers' advisor for several years, who also consulted with their accountant, Ed Murray. They drafted a contract intending to transfer the corporate stock with the optimal tax effect, with the following terms:

1. The stock was sold for $50,000.
2. The Nelsons acknowledged an outstanding debt from Hi–Banks Corporation to the Brubakers of $50,000, and promised to pay it.
3. The corporation gave the Brubakers a promissory note, which called for payment of the $50,000 debt in 10 years, due April 1, 1989. The corporation also promised to pay the Brubakers 10% interest, in yearly installments, for a total of $5,000 per year.

In sum, the sale price was $100,000 plus $50,000 in interest.

Donald Brubaker contends that the written contract did not state the real terms of the parties' agreement and that the Nelsons orally agreed to pay an additional $150,000 in cash for the resort, in ten yearly installments of $15,000 each. Brubaker admitted at trial that he and his wife planned to evade paying income taxes on the extra $150,000, and argued that Edith and the Nelsons openly acknowledged the oral agreement. Donald Brubaker brought this action in April 1984 after the Nelsons refused to make payments pursuant to the alleged oral agreement.

Donald Brubaker stated at trial that the Nelsons made one payment under the oral contract. He testified that in about 1980,

Adrian Nelson brought $10,000 cash in an envelope to the Brubakers. Five thousand dollars of this money was interest on the written note, and $5000 was a payment on the oral agreement. Thereafter the Nelsons paid only $5000 per year in interest payments, the payment required by the written agreement. Donald testified that the Nelsons said they were short of money, and the Brubakers agreed to let them defer the oral payments.

At trial the Nelsons and Edith Brubaker denied the $10,000 cash payment was ever made. Appellant introduced a ledger entry in his wife's handwriting, recording a $10,000 payment received. Edith Brubaker admitted it was her writing, but testified that she made the entry without knowing what it meant:

Well, he came up with this book one day. I don't know where it even came from. He told me he wanted me to write this down. He had mentioned to me before and when we were arguing about getting more money, that he should get $100,000 more and I asked him where he came up with that figure and he just said, "Well, that's how much we should have got." So, when he brought me this and he told me to write, he was going to keep a record, and I said, "Well, okay." This again, I was trying to avoid an argument. When he said to do something, I—nine times out of ten, I did it. So, he started asking me to write this down, as I did.

Donald Brubaker testified that around 1981 he and his wife attempted to have the oral agreement recorded, so that all of their children would share in the resort proceeds if the parents should suddenly die. They obtained a standard contract for deed form, which his wife filled out. Appellant testified that Adrian Nelson flatly refused to sign the document, and then Edith Brubaker destroyed it. When appellant tried to record the agreement again, abandoning his previous intention to evade paying taxes, his wife refused to participate.

Three witnesses testified in support of Brubaker's claim that the oral agreement was made between the parties. All three were guests at the resort and all testified as to separate conversations that supported appellant's claim that the resort was sold for $250,000 rather than $100,000, and that $150,000 was "under the table."

The trial court submitted the following special interrogatory to the jury:

Prior to or at the time that the parties herein entered into the written sales agreement on March 15, 1979, for the sale and purchase of Hi–Banks Resort Corporation, did Donald and Edith Brubaker and Adrian and Diane Nelson enter into an additional oral agreement whereby the Nelsons would pay the Brubakers, over and above the stated purchase price set forth in the written contract, an additional $150,000 to be paid at $15,000 per year for ten years?

The jury answered affirmatively, finding for appellant.

Respondent moved for judgment notwithstanding the verdict or for a new trial, on several grounds. The trial court set the verdict aside, holding that appellant was barred from seeking relief on grounds of a contract *in pari delicto*, and ordered judgment for respondents. The court also granted respondents a new trial in the event the case was remanded, citing in particular the conduct of appellant's attorney in marking a prior draft of a written agreement that had been ruled inadmissible and holding it in her hand during questioning of a witness. The court also noted strong "personality conflicts" between trial counsel and "rude and abrasive" behavior by counsel, making an impartial verdict impossible.

In 1983, Edith left Donald and moved to California, and he filed for divorce. The parties had been married for 26 years. A friend of Edith's testified at trial that the day she returned to their home to pick up her property awarded in the divorce, she told Donald, "That doctor of yours promised me you would be dead in five years, and you didn't die."

Donald's physician testified that Donald's illness has progressed and is at its "end stage." Concentration is difficult for

him, his speech is slurred and at times incoherent, and he is subject to fatigue. His physician expressed amazement that he had been able to function as a witness during the trial, conducted late in 1986.

Donald Brubaker appeals on the grounds that the trial court erred in granting judgment notwithstanding the verdict, and in granting a new trial.

### ISSUES

1. Was it error to grant judgment notwithstanding the verdict based on the doctrine of *in pari delicto?*

2. Were respondents entitled to a new trial on the ground of attorney misconduct?

3. Is the contract enforceable against the corporation or only against the individuals?

### ANALYSIS

#### I.

■ If the verdict had reasonable support in the evidence, it must be accepted as final by both the trial court and by this court. *Bigo v. Duluth, Missabe & Iron Range Railway,* 262 Minn. 471, 476, 115 N.W.2d 230, 233 (1962). In considering respondent's motion for judgment notwithstanding the verdict, the trial court was required to view all the evidence and the credibility of adverse witnesses in the light most favorable to the verdict, and to admit every reasonable inference therefrom. *Melin v. Johnson,* 387 N.W.2d 230, 232 (Minn. Ct.App.1986), *pet. for rev. denied* (Minn. July 31, 1986); *Bigo,* 262 Minn. at 476, 115 N.W.2d at 233. Only if the evidence was practically conclusive against the verdict or if reasonable minds could reach but one conclusion against the verdict, should the verdict have been overturned. *Melin,* 387 N.W.2d 232.

■ The doctrine of *in pari delicto,* based on judicial reluctance to intervene in disputes between parties who are mutually involved in wrongdoing, holds that "anyone who engages in a fraudulent scheme for-

feits all right to protection, either at law or in equity." *State v. AAMCO Automatic Transmissions, Inc.,* 293 Minn. 342, 347, 199 N.W.2d 444, 448 (1972) (quoting *Kansas City Operating Corp. v. Durwood,* 278 F.2d 354, 357 (8th Cir.1960)).

■ In its memorandum, the trial court explained that appellant sought "judicial relief from his own fraudulent scheme," and that the scheme was particularly troubling because it benefited only the Brubakers. "If the doctrine of *in pari delicto* is alive and well in Minnesota," the court said, "then this is the exact type of fact situation in which a Plaintiff should be barred from getting judicial relief from the Courts." The trial court concluded that the contract was made with the intent to evade taxes, and therefore the doctrine of *in pari delicto* applied, barring appellant from receiving any relief.[1]

The oral contract here was not illegal in its making or in its performance. Moreover, judicial enforcement of the contract does not facilitate an unlawful scheme or give appellant the fruit of such an arrangement.

The doctrine of *in pari delicto* applies to parties to an illegal contract. *AAMCO,* 293 Minn. at 347, 199 N.W.2d at 448. The doctrine also was extended to "tortious transactions based upon fraud or similar intentional wrongdoing." *Id.* In *AACMO,* it was not illegal in itself to enter into the contract, but the performance of the contract's terms constituted illegal activity.

In *AAMCO,* the franchiser of automobile transmission repair shops created deceptive advertisements for its franchisees. *Id.* at 343–44, 199 N.W.2d at 445–46. In a suit brought by the state to enjoin the deceptive practices, the franchisee cross-claimed against AAMCO, arguing that AAMCO forced its franchisees to use and pay for the deceptive advertisements, precipitating the state's action against them and harming the franchisee's business. *Id.* On appeal by the franchisee, the supreme court held that the doctrine of *in pari delicto*

1. Respondent has not disputed the admission of parol evidence on the parties' contract or any other issues affecting the significance of the jury's verdict for appellant.

barred the franchisee's claim because his participation in the fraudulent advertising was "both knowing and willing." *Id.* at 348, 199 N.W.2d at 448. Under the franchise contract the franchisee was trained in the fraudulent practices, and was required to use the deceptive advertising prepared by AAMCO. *Id.* Thus, the contract's terms required illegal activity, and performance of the contract consisted of engaging in illegal activity.

In *Pettit Grain & Potato Co. v. Northern Pacific Railway Co.*, 227 Minn. 225, 229, 35 N.W.2d 127, 131 (1948), a railroad company leased part of its right-of-way in an agreement which stipulated in part that the railroad would be exempt from liability from loss caused by fire set by its locomotives. This exemption could include a loss caused by criminal acts of the railroad's employees. *Id.* at 235, 35 N.W.2d at 133.

The supreme court stated that "[a] bargain which involves the commission of a crime, either as a consideration therefor or in the performance thereof, is invalid as against public policy." *Id.* at 232, 35 N.W.2d at 131. In *Pettit*, however, the court found that nothing in the contract called for or invited a criminal act.

Under these cases, the application of the doctrine of *in pari delicto* is appropriate for (1) preventing enforcement of a contract the performance of which is illegal; (2) preventing enforcement of an equitable remedy when the parties have been involved in mutually unlawful activity; or (3) use as a defense in a tort claim of one party against another. We find no cases where the doctrine was used to defeat the performance of a contract which was in itself not illegal.[2]

We acknowledge the trial court's concern that recognizing this type of contract can help those who have unlawful purposes. We recognize, however, that courts' efforts in enforcing contracts may often harmonize with fraudulent or unlawful plans of a litigant that are not directly involved in the transaction before the court. In Minnesota, the doctrine of *in pari delicto* has not been extended to reach beyond the actual course of unlawful behavior. The cases recognize that judicial refusal to be involved arises only in those cases where the court is asked to do something that is itself part of the unlawful act.[3]

## II.

■ A new trial is not warranted for two reasons: no compelling reasons justify disregarding the jury verdict, and the interests of justice require that appellant not be made to go through another trial.

In his memorandum, the trial judge discussed the conduct of the attorneys which justified the new trial. Appellant's attorney's "marking of a prior draft or version of the written agreement and holding it in hand during questioning of a witness" was cited as the primary example of misconduct, because the alleged agreement was at the very heart of the trial. The judge continued:

> In addition to the above problems during the specific parts of the trial, the entire litigation in the presence of the Jury was

2. Appellant has cited the case of *Hield v. Thyberg*, 347 N.W.2d 503 (Minn.1984) for the proposition that deception in the intent behind an oral contract did not rise to the level of an illegal contract in violation of public policy. In *Hield*, only part of the consideration, $15,000, was expressed in the written part of the contract and the note for the additional $35,000 was to be kept secret from the Small Business Administration to enable plaintiff to obtain a SBA loan. As in this case, the contract itself and its terms were not illegal, but the intended purpose of making part of the contract under the table was allegedly to make possible a fraudulent scheme. In *Hield*, the supreme court said nothing regarding the effect of the parties' fraud upon the enforceability of the oral agreement. We acknowledge that the facts are similar, but the claim of illegality was not raised by the defendant or discussed sua sponte by the supreme court.

3. Appellant's proof that the original written contract was aimed at accommodating an unlawful purpose gave him the right to submit parol evidence of another agreement. *See Hield*, 347 N.W.2d at 508. We observe, as did the trial court, the legally sanctioned utility thus found by appellant for a wrongful scheme. We also observe, however, that appellant's proof in this regard disavows the original scheme and is not used to carry out the scheme with judicial assistance.

permeated by personality conflicts between the trial counsel as well as conduct at times that could only be described as rude and abrasive, to the point that the Jury might well have felt the real issues to be settled were directly between the Plaintiff and his ex-wife or between the two attorneys instead of these litigants. Given that general atmosphere, I do not think any of the parties could receive a totally impartial verdict from the Jury. That, however, is not the fault of the Jury and a new trial I feel would be warranted if the judgment herein were to be later vacated.

The judge's opinion was that the lawyers' conduct could have influenced the jury. However, none of the pollutants to objectivity of the trial rises to the level that would justify a new trial, particularly in light of appellant's inability to testify again.

The general friction between the attorneys was mutual; both engaged in bitter exchanges and personal insults. In addition, the trial court's impression of prejudice was mixed such as to justify a new trial. That the jury "might well have felt" the issues were personal is equivocal; we do not find in the record a basis to believe the jury was unfairly influenced. Finally, there is no indication the attorneys' abrasiveness interfered with the trial or with the judge's control of the courtroom. At the end of the trial, out of hearing of the jury, the judge told the attorneys

this has been a very long and hard-fought trial. * * * no matter what the final decision in this case turns out to be, each of the parties here can go away from this lawsuit knowing that their attorney was an aggressive advocate for their position—perhaps maybe sometimes too aggressive in the Court's opinion, but at least each of you know that neither side suffered from want of having attorneys in there fighting tooth and nail for their position. So, I just want each of the sides to know that because too often, clients have attorneys; sit back later and judge the value of their attorney's services by what a jury does. What a jury ultimately does sometimes is

controlled by facts in evidence that the attorneys have no control over. But, in any event, both sides here can rest assured that they have had an aggressive fight for their position.

These comments indicate the judge felt that both attorneys maintained highly adversarial positions and the hard-fought nature of the trial did not bias the jury.

As for appellant's counsel's actions, marking and holding the exhibit in hand while questioning a witness, she claimed she intended to offer it again for a different purpose, knowing the judge had ruled it inadmissible for one purpose. The record shows no objection by opposing counsel nor any comment by the trial court. This action did not rise to the level of blatant misconduct that would allow us to overlook the lack of objection. *See Wild v. Rarig*, 302 Minn. 419, 433, 234 N.W.2d 775, 786 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). Nothing in the record indicates the conduct flagrantly violated the interest of respondent or the integrity of the court.

Finally, the interests of justice strongly weigh against a new trial. The jury here was given a single issue of fact to decide, taking into account plaintiff's burden to clearly prove the existence of the contract. Given his condition, it will likely be impossible for appellant to repeat his presentation and meet that burden.

### III.

■ We agree with the trial court that the contract should not be enforced as against the corporate defendant. As the court held, there is no evidence sustaining the corporation's involvement in the parties' oral agreement. The sale of stock was between individuals.

### DECISION

We reverse the order of judgment notwithstanding the verdict and reinstate the jury verdict establishing the existence of an oral contract between the parties for payment of $150,000. The trial court's grant of a new trial was not supported by

evidence of flagrant misconduct by counsel, and the interests of justice demand no new trial be held. We affirm the trial court's holding that the contract should be enforceable against the individual respondents rather than the corporation.

Reversed in part, affirmed in part.

FOLEY, J., dissents.

FOLEY, Judge (dissenting).

I respectfully dissent. Although I agree that the provisional order for a new trial was unwarranted, particularly in light of Brubaker's failing health, it is my considered opinion that the trial court should be affirmed based on the doctrine of *in pari delicto.*

The majority correctly recites the doctrine of *in pari delicto:* "Generally, anyone who engages in a fraudulent scheme forfeits all right to protection, either at law or in equity." *State v. AAMCO,* 293 Minn. 342, 347, 199 N.W.2d 444, 448 (1972). However, the analysis need not proceed any further. By engaging in a scheme to defraud taxing authorities, the parties forfeited their right to court protection.

Instead of applying the doctrine of *in pari delicto* as stated in *AAMCO* to the facts of this case, the majority finds the doctrine is limited to cases where performance of the contract is itself illegal. I respectfully submit the majority's decision undercuts the strong public policy considerations upon which the doctrine is grounded.

The doctrine of *in pari delicto* is based upon judicial reluctance to intervene in disputes where both parties are wrongdoers in equal fault. *Id.* The doctrine is designed to both punish the wrongdoer and keep courts out of the awkward position of being thrust into the middle of a fraudulent scheme, "forced to sort out truths and untruths in a make-believe land." *Long v. Smead Manufacturing Co.,* 383 N.W.2d 452, 455 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. May 29, 1986).

The parties are certainly wrongdoers, having created an instrument to further the Brubakers' scheme to evade taxation. And indeed, the trial court was in the awkward position of delving into the parties' make-believe world of falsified records, having to award judgment to the Brubakers if they sufficiently proved their own fraudulent intent in falsifying the records. This is a prime example where public policy is best served by our refusal to hear the dispute and leave the conspiring parties where they stand.

I appreciate the majority's struggle to determine how closely related a contract must be to a "fraudulent scheme," as the phrase is used in *AAMCO,* before a court should invoke the doctrine of *in pari delicto.* I suggest the court in *Kansas City Operating Corp. v. Durwood,* 278 F.2d 354 (8th Cir.1960), from which the rule in *AAMCO* derives, has articulated a fair and workable standard. This standard provides that where the contract is only remotely related to the unlawful transaction, a court should enforce the contract if the plaintiff can make out its case without having to rely on the unlawful transaction. *Durwood,* 278 F.2d at 359 (quoting *Missouri Fidelity & Casualty Co. v. Art Metal Construction Co.,* 242 F. 630, 632 (8th Cir. 1917)).

In this case, the unlawful transaction is the parties' falsifying records in furtherance of a tax avoidance scheme. The oral contract of sale is, of course, a separate transaction. However, the only way to prove the oral contract is to first argue that the written contract was invalid because it was intended only to deceive the taxing authorities. *See Hield v. Thyberg,* 347 N.W.2d 503, 508 (Minn.1984) (parol evidence generally inadmissible to alter terms of written contract except where written contract was created merely to deceive a third party). By so arguing, the Brubakers are relying on the unlawful transaction to prove the oral contract. Therefore, the oral contract would be unenforceable under the standard set forth in *Durwood.*

For the reasons stated, I would affirm the trial court's order for judgment notwithstanding the verdict.